FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 19 2009

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS

LONG ROWS, INC.,                          *
                                          *
                                          *
                                          *    CIVIL ACTION NO. 3:09-CV-142SWW
                                          *
                                          *
              Plaintiff,                  *
                                          *
VERSUS                                    *
                                          *
BAYER CROPSCIENCE, LP,                    *
                                          *
              Defendant.                  *    This case assigned to District Judge Wright
                                          *    and to Magistrate Judge Cavaneau

## COMPLAINT

Plaintiff Long Rows, Inc. ("Plaintiff"), by undersigned counsel, upon personal knowledge and upon information and belief as to all other matters, alleges in support of this Complaint the following:

### I.    STATEMENT OF THE PARTIES

1. Plaintiff Long Rows, Inc. is a corporation formed and registered under the laws of the state of Arkansas with its principle place of business in Proctor, Arkansas.

2. Defendant Bayer CropScience is a corporation formed under the laws of the State of Delaware with its principle place of business in Research Triangle, North Carolina.

### II.    NATURE OF THE ACTION

3. "LL601" and "LL604" rice ("Liberty Link Rice"), are types of genetically-modified ("GM") rice seed developed, manufactured, and field-tested in the United States by Defendant Bayer CropScience, LP ("Bayer," "Bayer CropScience," or "Defendant"). LL601

and LL604 rice are varieties of long-grain rice that have been genetically modified with a bacterial gene trait that causes the rice grown from that seed to produce a protein that makes the crop resistant to glufosinate – the active ingredient in Liberty® Herbicide, another Bayer product. This "glufosinate-tolerant" trait allows growers to spray Liberty® herbicide over the entire crop, killing all weeds without risking any damage to the rice crop.

4.     LL601 rice was not approved for human consumption in the United States until November 2006. LL601 rice has not been approved in any other country in the world besides the United States. LL604 has not been approved for human consumption by any country in the world.

5.     LL601 and LL604 rice were field-tested by Bayer in the United States between 1998 and 2001. At the time Bayer was field-testing LL601 and LL604, Bayer had not sought to have the rice approved for human consumption and had not obtained regulatory approval for LL601 or LL604 rice. LL601 rice is presently deemed fit for human consumption in only the United States. LL604 has not been deemed fit for human consumption.

6.     Bayer never sought to commercialize or otherwise market LL601 or LL604 rice because of warnings from millers and processors as well as domestic and foreign producers that they would reject it. On information and belief, genetically-modified rice is not commercially grown anywhere in the United States.

7.     Under a coordinated regulatory framework, the United States Department of Agriculture's ("USDA") Animal and Plant Health Inspection Service ("APHIS"), the Food and Drug Administration ("FDA"), and the U.S. Environmental Protection Agency ("EPA") share responsibility for regulating biotechnology products to ensure that approved products developed in the United States undergo a rigorous pre-approval testing protocol to

determine that they pose no risk to human health or the environment. As genetically-modified products, neither LL601 nor LL604 rice could legally be commercialized without such approval.

8. Significantly, during the years Bayer was field-testing LL601 and LL604 rice and thereafter, Bayer was aware that conventional rice (non-GM) could become contaminated with LL601 and LL604 rice in many ways, including, *inter alia*, cross-pollination and commingling during harvest, storage, transport, and disposal.

9. Notwithstanding this knowledge, Bayer failed to take steps to prevent cross-pollination and other contamination of non-GM rice with LL601 and LL604 rice. Additionally, Bayer knew, or should have known, before it grew or otherwise disseminated LL601 and LL604 rice seed, that such cross-pollination could be prevented.

10. Bayer also failed to take the steps to prevent commingling of LL601 and LL604 rice with non-GM rice during test planting, harvest, handling, storage, transport and disposal.

11. Additionally or alternatively, Bayer knew, or should have known, before it grew or otherwise disseminated LL601 and LL604 rice seed, that the U.S. rice production and marketing chain is a commodity-based system that gathers, commingles, and ships rice from tens of thousands of farms through local, regional, and terminal elevators, that widespread commingling of LL601 and LL604 rice with non-GM rice could not be prevented, and that segregation of rice that has been grown or pollinated by GM rice lines – including LL601 and LL604 rice – materially destroys the commercial viability of that crop.

12. The scope of Bayer's alleged wrongdoing is astronomical. Not only has the news of the contamination of the United States rice supply with Bayer's LL601 rice decimated the rice futures market and the willingness of our export partners – including the

3

EU countries and Japan – to accept U.S. rice imports, but as of August 29, 2006, Richard Bell, the Arkansas Secretary of Agriculture, confirmed that LL601 rice is now present in a large percentage of milled rice grown in the United States:

> Almost all the tests are showing up positive. It hasn't shown up in some of the rough rice. **But I'm not aware of any milled rice it hasn't shown up in.** That means the problem may be more than one variety. Or, perhaps, it's a result of variety mixing in storage...

Delta Farm Press, August 29, 2006 (emphasis added) (http://deltafarmpress.com/news/060829-arkansas-gmo/).

13.    In March 2007, it was revealed that Bayer's LL604 rice is also present in a large percentage of rice grown in the United States.

14.    Bayer's conduct with respect to the events giving rise to the contamination of the U.S. rice supply with LL601 and LL604 rice is particularly egregious, in light of the fact that Bayer (by its predecessor company, Aventis CropScience USA), created the same type of GM contamination of the U.S. corn market less than six years ago.

15.    Plaintiff is a rice farmer who has commercially cultivated or harvested non-GM rice during the below-defined relevant time period. Plaintiff seeks relief for compensatory and consequential damages, punitive or exemplary damages, and injunctive relief arising from, *inter alia*:

> (a)    Bayer's failure, either by itself or through its agents, to adequately warn LL601 and LL604 rice experimental field project growers of the necessary precautions and limitations to prevent LL601 and LL604 rice from entering the food chain;

> (b)    Bayer's growing and/or other dissemination of LL601 and LL604 rice with the knowledge that LL601 and LL604 rice were not approved at that time for human consumption yet was likely to contaminate non-GM rice through cross-pollination or other means;

> (c)    Bayer's growing and/or other dissemination of LL601 and LL604 rice with the knowledge that LL601 and LL604 rice

were likely to contaminate through commingling with non-GM rice in cultivation, harvesting, handling, storage, transport and disposal; and

(d)     the harm to Plaintiff resulting from LL601 and LL604 rice contamination of the general U.S. rice supply and its entry into human food channels, in the form of, *inter alia*: (i) diminished prices for U.S. rice resulting from loss of export and domestic markets for that rice; (ii) diminished prices for U.S. rice and/or increased grower costs resulting from the need to, *inter alia*, maintain the integrity of the U.S. rice supply and/or to keep LL601 and LL604 rice from further entering the general U.S. rice supply and export channels; (iii) through the contamination of the entire rice farming and production chain, including, but not necessarily limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment; (iv) through the costs of testing and other costs associated with certifying that one's rice crops is free of LL601 and LL604; and (v) through the costs of cleansing and eradicating the genetically-modified rice from all farm equipment, storage facilities, harvesting equipment, and transportation equipment.

## II.  JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff's claims exceed the jurisdictional minimum amount in controversy of $75,000, exclusive of costs and interest.  Further, this dispute is between an Arkansas citizen and a citizen of another state.  28 U.S.C. § 1332(a)(1).

17.     This Court has jurisdiction over Defendant because it is a business entity actively doing business in the State of Arkansas, has sufficient minimum contacts in Arkansas, or otherwise intentionally avails itself of the markets within the state, through manufacturing, production, promotion, sale, marketing, and distribution of its products in Arkansas, to render the exercise of jurisdiction by this Court proper and necessary.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant provides services to Plaintiff in this District, conducts substantial business in this

District, resides in this District, or otherwise has sufficient contacts with this District to justify it being fairly brought into court in this District.

## III.    PARTIES

### A.    Plaintiff

19.    Plaintiff, Long Rows, Inc., has engaged in an ongoing rice farming operation in the State of Arkansas at least since 1986 until the present time.  Plaintiff has never knowingly grown LL601 or LL604 rice.

### B.    Defendant

20.    Bayer CropScience L.P. ("Bayer" a term which, when used herein, includes Bayer CropScience L.P.; its parent company, Bayer AG; its predecessor companies – including Aventis CropScience USA Holding, Inc.; and all of its subsidiaries and affiliates) is a Delaware limited partnership headquartered at 2 T. W. Alexander Drive, Research Triangle Park, North Carolina 27709.

21.    Bayer CropScience, which was formed when Bayer AG bought Aventis CropScience USA Holding, Inc. in October 2001, is a limited partnership that, by itself and through its parent, subsidiary, and predecessor entities, produces and has produced, *inter alia*, genetically-modified and bioengineered rice seed, including, but not limited to LL601 and LL604 rice.  Bayer conducts business throughout the United States, including Arkansas, the state in which Plaintiff cultivates and harvests rice.

## IV.    FACTUAL ALLEGATIONS

### Rice Cultivation in the United States

22.    According to the USDA, the United States provides about 12% of the world rice trade.  Estimates for the 2006 crop year value rice production in the United States as approximately $1.9 billion.

23.     The acreage devoted to rice currently averages about one percent of the total cropland harvested in the United States.  All U.S. rice is produced from irrigated fields, with yields among the highest in the world.

24.     Rice production in the United States is concentrated in six states:  Arkansas, California, Louisiana, Mississippi, Missouri and Texas.  Arkansas has the 4th largest area devoted to long grain rice production accounting for about 88% of the acreage in Arkansas and 49% of the U.S. crop.

25.     In the United States, rice is referred to by length of grain: long, medium and short.  Long-grain rice, grown almost exclusively in the South, accounts for nearly 75% of U.S. rice production.   More than 80% of Arkansas' rice production is long-grain rice.  Medium-grain rice, grown both in California and the South, accounts for almost a fourth of total U.S. rice production and nearly all of California's rice crop.  Short-grain rice is grown mostly in California and accounts for one to two percent of the total U.S. rice crop.   In addition, the United States produces very small amounts of specialty rices, including aromatic or fragrant varieties.

26.     The most common rice in the U.S. is Southern Long-Grain rice.  This type of rice is also the most common rice consumed in the world.  In 2005, 80% of U.S. rice exports were long-grain varieties.  The majority of domestic utilization of U.S. rice is direct food use (58%), while sixteen percent is used in processed foods and beer respectively.   The remaining ten percent is found in pet food.

27.     Cross pollination occurs in rice.  In natural conditions, when a weedy rice strain occurs within a cultivated rice crop, the flowering time, plant height and other features of the weedy rice will tend to shift to a point that is similar to the cultivated rice varieties growing in the same field, because of their cross-pollination and genetic recombination.

According to published studies, as in many other crop species, transgene escape from cultivated rice varieties to their weedy and wild relatives through gene flow has become an indisputable fact.

28.    The United States' rice marketing system is commodity-based. Rice grown throughout the United States is harvested, gathered, commingled, consolidated, and otherwise shipped from the thousands of farms upon which it is cultivated through local, regional and terminal distribution centers.

29.    Rice storage and transportation facilities are generally not equipped to test and segregate rice varieties and to undertake testing and segregation at these facilities causes disruption and expense.

**Genetically-Modified Seeds**

30.    Biotechnology has made it possible to introduce new genetic characteristics into plant seeds. The genetic composition (or "genome") of a seed can be altered by transferring a transgenic "event" into the seed genome. An event contains, among other things, a specific gene that expresses a desirable characteristic in the seed. The insertion of a specific transgenic event into a seed alters or modifies a seed's genome, conferring a desired characteristic or "trait" onto the crops grown from the seed.

31.    Genetically-modified seeds are created through laboratory processes whereby genetic material from a foreign species is inserted into the DNA of a traditional plant to affect a desired trait in the future generations of that plant. Genetically-modified crops include LL601 and LL604 rice which are at issue in this action.

32.    LL601 and LL604 rice have been genetically modified to be resistant to glufosinate – the active ingredient in Liberty® Herbicide, another Bayer product. This

"glufosinate-tolerant" trait allows growers to spray Liberty® Herbicide over the entire crop, killing the weeds without risking any damage to the rice crop.

33.    In the United States, the first genetically-modified food produce (a delayed-ripening tomato) was marketed in 1994. Since their advent and commercial introduction, genetically-modified seeds have been adopted by farmers at unprecedented rates. During that time, genetically-modified seeds have become available for many crops. Notwithstanding that fact, GM rice has never been commercially grown in the United States.

**LL601 and LL604 Rice**

34.    As genetically-modified products, LL601 and LL604 rice were subject to regulatory approval prior to commercialization. Bayer never obtained this approval for LL601 rice prior to LL601 infiltrating the United States rice crop. To date, Bayer has not obtained approval of LL604 in the United States or in any other country in the world.

35.    In testing, growing, transporting, storing and disposing of LL601 and LL604 rice, Bayer failed to comply with responsible growing practices. Bayer knew that it was impossible to completely isolate LL601 and LL604 rice from other varieties of rice and that LL601 and LL604 rice would inevitably cross-pollinate with other rice plants.

36.    Furthermore, Bayer was aware, or should have been aware, that unless strict precautionary measures could be implemented at all levels from the farm planting through the distribution, transportation, storage and disposal chain – given the nature of the U.S. grain handling system – LL601 and LL604 rice would contaminate the entire U.S. rice crop and infiltrate the general U.S. rice supply.

**Problems Emerge**

37.    In late 1998 and early 1999, concerned with the health and safety aspects of genetically-modified crops, the general public in many European Union ("EU") countries

rejected food products containing genetic modifications of any type. These European-based concerns slowed European registrations for various biotech products. In some cases, registrations were denied.

38.    Bayer was aware of these concerns regarding the health and safety of biotech aspects of products such as LL601 and LL604 rice and the potential detrimental market effects arising therefrom.

39.    Bayer's predecessor, Aventis CropScience USA Holding, Inc., conducted field tests of LL601 and LL604 rice between 1998 and 2001. Aventis ultimately decided not to commercially develop this product.

40.    With respect to this non-commercialized, unapproved, genetically-modified rice, the *Houston Chronicle*, in May 2001, reported:

> One by one Monday, 18-wheel trucks began hauling away nearly 5 million pounds of genetically modified rice from a Brazoria County farm to a landfill for burial.

> The rice, the first to be genetically enhanced, was approved by the US Food and Drug Administration and the United States Department of Agriculture, but approval by the Environmental Protection Agency is pending. Without EPA approval, the rice cannot be served as food, say officials with Aventis CropScience which developed the biotech rice.

> The rice could have been marketed for human consumption had it remained in storage bins until the EPA granted approval, but Aventis wanted to be sure it could properly manage the experimental crop and track its location, said Peg Cherny, a company spokeswoman.

> Aventis has been criticized for losing track of some of its genetically modified StarLink corn, which reached consumers before it had received government approval.

Aventis 'didn't want to create an issue' with its biotech rice, Cherny said. The rice has been dubbed 'LibertyLink' because it is resistant to Liberty herbicide, a weed killer commonly used on corn and canola.

\* \* \*

Harvested last August, about 250,000 pounds will be retained for Aventis to use for testing. The rest, about 4.75 million pounds, will be buried.

*Houston Chronicle, May 22, 2001*

41.    On August 19, 2006, Mike Johanns, the United States Secretary of Agriculture, announced that unapproved rice had been found in supplies destined for human consumption and for export.

42.    An August 22, 2006 article in the *New York Times*, Riceland Foods, an Arkansas-based farmer-owned cooperative, disclosed that rice samples from its five-state growing region – Arkansas, Mississippi, Missouri, Louisiana and Texas – had tested positive for LL601 rice. Agriculture Department officials later said LL601-contaminated rice had been found in bins in Arkansas and Missouri and held rice from the 2005 crop, although the rice in those bins might have come from other states.

43.    Riceland, based in Stuttgart, Arkansas, is a farmer-owned cooperative which markets rice produced by its 9,000 farmer-members in the Southern rice-producing states. In 2005, Riceland marketed rice produced in 2005 for farmers in Arkansas, Missouri, Mississippi, Louisiana and Texas.

44.    On or about August 18, 2006, Riceland stated that the existence of a genetically-modified product in its rice was discovered in January 2006, by one of its export customers. Riceland said that because genetically engineered rice was not grown

commercially in the United States, it initially thought that a small amount of genetically engineered corn or another crop had been mixed in with rice, perhaps through the use of a common means of transportation.

45.     On or about the same date, Riceland further disclosed that in May 2006, Riceland collected rice samples from several grain storage sites and found positive results for the Bayer LL601 rice trait.  Riceland stated that it advised Bayer of its findings, which confirmed those findings and said the LL601 rice was present at levels equivalent to 6 of every 10,000 grains.  Despite this admission, Bayer did not report these findings to the U.S. government until July 31, 2006.  LL601 rice was subsequently discovered at the Crowley Rice Station in Louisiana.

46.     This widespread LL601 rice cross-pollination and contamination has had a broad and adverse impact on Plaintiff and all rice farmers.  Bayer's wrongful conduct has rendered millions of bushels of U.S. rice, grown on tens of thousands of acres of U.S. farmland, unfit for human consumption or otherwise suspect in the global rice markets, which has resulted in worldwide market value loss for U.S. rice.

47.     An August 22, 2006 *Wall Street Journal* article reported:

> Trading partners abroad began tightening their controls on American-grown rice after discovery of an accidental release of a genetically modified variety unapproved for sale by U.S. regulators.

> Prices of rice futures contracts sank yesterday as countries such as Japan and South Korea moved to prevent the genetically modified rice from coming into their markets from the U.S., which counts on foreign customers to buy roughly half of its annual production.

> * * *

> In trading at the Chicago Board of Trade yesterday, the price of the rough rice contract for November delivery dropped 26 cents a hundredweight to settle at $9.84 a hundredweight."

48.    On August 22, 2006, rice futures fell by the daily trading limit of 50 cents per hundredweight – or more than five percent – the sharpest one-day decline in several years. Since news of the commingling was first released, the market price of rice at the Chicago Board of Trade has fallen approximately 8-10%, resulting in not less than hundreds of millions of dollars in losses for U.S. rice growers.

49.    In light of Bayer's disclosure, on August 23, 2006, the European Union issued the following statement banning imports of U.S. rice until U.S. rice is certified as being GM-free:

> The European Commission has today adopted a decision requiring imports of long grain rice from the USA to be certified as free from the unauthorized GMO LL Rice 601. The decision has been taken in light of the recent announcement by the US authorities that this unauthorized GMO had been found in samples of commercial rice on the US market (see MEX/06/0821). The emergency measures adopted by the Commission today mean that, with immediate effect, only consignments of US long grain rice that have been tested by an accredited laboratory using a validated testing method and accompanied by a certificate assuring the absence of LL Rice 601 can enter the EU.
>
> Markos Kyprianou, Commissioner for Health and Consumer Protection, said "We have strict legislation in place in the EU to ensure that any GM product put on the European market has undergone a thorough authorization procedure based on scientific assessment. There is no flexibility for unauthorized GMOs – these cannot enter the EU food and feed chain under any circumstances, the measures we have taken today will ensure that unauthorized GM rice is not inadvertently imported. EU consumers can rely on the high level of protection that our GM rules afford them."
>
> Under EU food safety legislation, only GMOs which have undergone a thorough scientific assessment and authorization procedure may be put on the EU market. The decision adopted today therefore aims to prevent the unauthorized LL Rice 601 from reaching EU consumers, by ensuring that only rice certified as free from this GMO enters the EU. The measures will enter into effect immediately, and are expected to be reviewed after 6 months.

Member States authorities are responsible for controlling the imports at their borders and for preventing any contaminated consignments from being placed on the market. In addition, they should carry out controls on products already on the market, to ensure that they are free from LL Rice 601. Business operators importing rice from the USA also have responsibility for ensuring that LL Rice 601 does not enter the EU food chain and that imports are certified as free from this unauthorized GMO, in accordance with the EU food law principle that operators are responsible for the safety of the food or feed that they place on the market."

50.     On August 29, 2006, the U.S. Rice Producer Association reported widespread positive results throughout the Gulf and Delta rice region in the 2005 and 2006 crops.

51.     In March 2007, it was announced that rice in the Gulf and Delta rice region also tested positive for LL604.

52.     Bayer knew, or should have known, that once LL601 and LL604 rice became commingled with the general U.S. rice supply, identity determination and segregation of the entire U.S. rice supply would be required in order to prevent LL601 and LL604 rice from entering the domestic and international food supply channels and that such a situation would involve huge disruptions in the rice trade, impose significant added costs on, *inter alia*, U.S. rice farmers, and detrimentally impact worldwide prices for U.S. rice causing severe financial damage to U.S. rice farmers.

53.     Despite these facts, Bayer tested LL601 and LL604 rice without adequate safeguards to prevent its release into the general rice market.

54.     On information and belief, Bayer failed to adequately instruct, oversee or control experimental field project growers to ensure that LL601 and LL604 rice crops were adequately segregated or contained adequate buffer zones.

55.    Such wrongful and deliberate conduct by Bayer led directly to the cross-pollination, contamination, and market deterioration problems that damaged Plaintiff and all rice farmers.  Prior to that time, Bayer had not obtained regulatory approval and had not sought to commercially develop and market the products because it knew that domestic and foreign buyers would reject them.

56.    Bayer's wrongful conduct also led to the direct introduction of contaminated rice into the United States consumer market – where it was never commercially grown before.  Moreover, and on information and belief, LL601 and LL604 have also infiltrated and contaminated the U.S. rice seed supply.

57.    The extent of the contamination of the U.S. rice supply and the resulting damages are still being determined.  The scope of damage arising from Bayer's conduct, however, is being recognized as far worse than originally believed.

58.    As a result of the presence of LL601 and LL604 rice in a wide range of rice crops in the United States, a large percentage of America's rice crop is not marketable in numerous export markets, including Japan, Canada, South Korea and the European Union.

59.    As a result of Bayer's wrongful conduct, Japan, the largest foreign market for U.S. rice, has already prohibited all imports of U.S. rice, and the European Union has prohibited all U.S. rice imports unless they have been scientifically tested and found not to be contaminated with LL601 or LL604.  In 2005, the U.S. exported 224,000 metric tons of rice to the 25-nation EU worth $813 million, of which 198,000 tons was long-grain rice.  Moreover, on information and belief, the government of Mexico – the largest importer of U.S. rice (125 million tons of U.S. rice exported to Mexico in 2005) – is still considering its response to the situation.

60.    LL604 has not been approved for human consumption by any country in the world, including the United States.  United States rice found to be contaminated with LL604 is unmarketable.

61.    Thus, as a result of Bayer's wrongful conduct, other rice processors and food manufacturers have become concerned about the presence of LL601 and LL604 rice in raw products coming into their food manufacturing facilities thereby further softening the market for U.S. grown rice and further damaging Plaintiff.

**The Further Impact of LL601 and LL604 Rice on Plaintiff**

62.    The introduction of LL601 and LL604 rice, as a result of Bayer's wrongful conduct, into the general human food supply has detrimentally affected the ability of Plaintiff to get rice into export channels through the storage, handling, processing, and export companies.  Furthermore, many rice exporters will undertake and require expensive and time-consuming testing of all rice crops prior to sale to determine that they are uncontaminated with LL601 and LL604 rice and thus, fit for human consumption.

63.    The economic burden of testing commercial rice crops and segregating rice contaminated with LL601 and LL604 from the U.S. rice supply will be transferred to U.S. rice farmers by, *inter alia*, diminished bids for rice brought to the market.

64.    The impact of rice testing will additionally burden rice farmers by, *inter alia*, potentially requiring loads of rice that test positive to be destroyed and deemed unfit for human consumption or barred from export.

65.    Moreover, the presence of LL601 and LL604 rice in rice food products and in the general U.S. rice supply has and will result in the loss of markets within the United States and certain export markets for American rice and reduced prices for all U.S. rice.

66.     Furthermore, the cost of segregating non-GM rice from LL601 and LL604 rice will be significant.  As a result of Bayer's wrongful conduct, as alleged in this Complaint, U.S. rice farmers, including Plaintiff, will be required to take extra steps and incur additional expenses in an effort to preserve the integrity and economic value of their rice crops.

67.     Many U.S. rice farmers, including Plaintiff, have also sustained damages to their property as a result of Bayer's wrongful conduct, through the contamination of the entire rice farming and production chain, including, but not necessarily limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment.

68.     Bayer's wrongful conduct continues to place Plaintiff at risk for further damages caused by the cross-pollination and contamination of its rice crops with Bayer's LL601 and LL604 rice and from the continued detrimental market effects of the LL601 and LL604 rice contamination on the U.S. futures market and, concomitantly, U.S. rice prices.

## V.     __INJURIES TO PLAINTIFF__

69.     The detection of LL601 and LL604 rice in the U.S. rice supply – and Bayer's conduct that led to this contamination – has already resulted in the loss of export markets and domestic markets for U.S. rice and will continue to do so.

70.     Moreover, market changes resulting from LL601 and LL604 rice contamination have created inefficiencies expressed in, *inter alia*, lower rice prices and higher producer costs.

71.     Due to the action of the Arkansas Rice Council, rice buyers will not accept deliveries without proof that the rice crops being delivered to them are free of LL601 and LL604 contamination – thus requiring expensive and time-consuming testing.  Furthermore, the costs of storing and moving LL601 and LL604 contaminated rice through segregated

channels will be significant. Storage and transportation entities must flow design and use systems and equipment and segregation. Indeed, before LL601 and LL604 rice were introduced, all rice could be handled in the same way. Rice farmers, including Plaintiff, will share the economic burden of these costs.

72.    As set forth above, the impact of testing for LL601 and LL604 rice contamination at various points in the rice marketing channel will add extra expense by leaving loads of rice that test positive out of certain markets. Rice farmers, including Plaintiff, will share the economic burden of these costs.

73.    Commodities traders, financial reporters, and agricultural officials have stated that LL601 and LL604 rice contamination has and will continue to detrimentally impact rice prices, rice futures prices and U.S. rice exports.

74.    As a result of Bayer's wrongful conduct, many rice farmers have also suffered harm to their property through the contamination of the entire rice farming and production chain, including, but not necessarily limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment.

75.    Plaintiff has been damaged and is at continued risk of further damages arising out of Bayer's wrongful conduct.

## VI.    CLAIMS ALLEGED

## COUNT I

### (Negligence)

76.    For the purposes of Count I, Plaintiff repeats and realleges each of the previous paragraphs above as though fully set forth herein.

77.    Bayer's acts or omissions as described above constitute negligence.

78.    Bayer had a duty to Plaintiff to test, grow, store, transport, and dispose of LL601 and LL604 rice in a manner that would not result in contamination of neighboring crops or the U.S. rice market.

79.    Bayer breached this duty by testing, growing, storing, transporting and disposing of LL601 and LL604 rice in violation of standards that would prevent contamination.

80.    In addition, or in the alternative, Bayer had a duty to refrain from testing, growing, storing, transporting and disposing of LL601 and LL604 rice in a manner that would foreseeably cause harm to Plaintiff.

81.    Bayer breached this duty by failing to exercise reasonable care to prevent the foreseeable contamination of the U.S. rice supply through cross-pollination and commingling that would naturally result from the testing, growing, storing, transporting and disposing of LL601 and LL604 rice as outlined herein.

82.    Such breaches are the direct and proximate causes of the damages suffered by the Plaintiff, as outlined herein.

83.    Plaintiff has suffered injury and property damage by the testing, growing, storing and disposing of LL601 and LL604 rice by Bayer as outlined herein and seeks

compensatory damages for the losses caused by Bayer's actions. Plaintiff is also entitled to injunctive relief requiring that Bayer decontaminate its farmland, its farming, harvesting and transportation equipment, and its on-farm storage facilities, to prevent future contamination for the 2007 growing season and beyond. Plaintiff further seeks punitive damages as a result of Bayer's reckless and willful conduct, and all costs and attorneys' fees allowed by law.

## VI.     REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment as follows:

A.     That the Court adjudge and decree that Bayer is liable to Plaintiff.

B.     That the Court order Bayer:

    (1)     To pay compensatory and consequential damages;

    (2)     To pay exemplary and punitive damages;

    3)     To undertake injunctive relief requiring the decontamination of Plaintiff's farmland, farming, harvesting, and transportation equipment, as well as on-farm storage facilities, to prevent contamination for the future growing seasons;

    (4)     To pay the costs of this action, including attorneys' fees and expenses;

    (5)     To pay pre- and post-judgment interest; and

    (6)     Such other and additional relief as the Court deems equitable, appropriate, and just.

## VIII.  JURY DEMAND

Plaintiff demands a jury trial on all claims so triable.

Dated: _____8/19/c9_____

Respectfully submitted,

_____

Andy D. Birchfield, Jr.
P. Leigh O'Dell
**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
P. Leigh O'Dell
Post Office Box 4160
Montgomery, AL 36104-4160
Email:  leigh.odell@beasleyallen.com
Tele:    (334) 269-2343
Fax:     (334) 954-7555


Russell D. "Davy" Carter III
T. Brent Walker
**CARTER WALKER, PLLC**
Post Office Box 628
Cabot, AR 72023
dcarter@carterwalkerlaw.com
Tele:    (501) 605-1346
Fax:     (501) 605-1348